ALMON, Justice.
The Boat Shack II, Inc. (“the Boat Shack”), Roger Bevan, and Cynthia Bevan appeal from a summary judgment entered in favor of the plaintiff, ITT Commercial Finance Corporation (“ITT”), on ITT’s claim for recovery of collateral. The appellants also appeal from the dismissal of their counterclaim. When it instituted this action, ITT used Rule 64(b), Ala.R.Civ.P., to obtain a writ of seizure of the property. Without using the procedure available under Rule 64(b) to have the writ of seizure set aside and without making a showing that they were not in default or that ITT was not entitled to possession of the secured property, the appellants filed a counterclaim alleging conversion, loss of business opportunity, wrongful repossession, and abuse of process.
In 1987 and 1988 the Boat Shack entered into three separate wholesale financing agreements with ITT whereby the Boat Shack obtained financing to purchase its inventory of boats, motors, trailers, and other equipment. The Boat Shack granted ITT security interests in the inventory. Roger Bevan signed the agreements in his capacity as president of the Boat Shack. Roger Bevan and Cynthia Bevan also signed personal guaranties of the debts.
On July 26, 1989, an ITT employee made a regular monthly inspection to determine the amount of inventory sold and the consequent amount due on the three financing agreements. Pursuant to that determination, the Boat Shack issued three checks totalling approximately $78,000. When the checks were presented for payment, the bank returned all three because the Boat Shack had insufficient funds in its account.
ITT sent its regional sales manager, Carl Bennett, to the Boat Shack’s premises to inquire about the dishonored checks. Bennett’s affidavit filed in support of ITT’s motion for writ of seizure stated that he visited the premises on August 3, 1989. The affidavit continues:
“When I arrived at the defendant’s office during regular business hours I discovered that the office was closed. I determined that the office had been closed since July 29, 1989 — only three days after the issuance of the worthless checks. I also determined that not a single employee or other person had been present on the premises since July 29, 1989— even though defendant in the past had employed about seven or eight employees. Thus, defendant had left unattended, our collateral for almost two weeks. There was a note on the door stating ‘Closed for Vacation. Service department is open around the corner from 8:00 — 5:00.’ I went ‘around the corner’ and discovered a boat repair shop. I spoke with two men in the repair shop who informed me that they leased the space from Roger Bevan, the owner of Boat Shack. The men informed me that although they repaired boats for Roger Bevan and the Boat Shack from time to time, they were not employed by Roger Bevan nor the Boat Shack. In fact, the two men informed me that Roger Bevan and/or the Boat Shack owed them approximately $30,000.00. Neither of the two men knew where Roger Bevan was, nor did they know what happened to the Boat Shack’s employees. I returned to the business premises during normal working hours on August 4, 1989, and again found the office abandoned. I had determined that defendant did not even have a night watchman present in the evenings to protect the inventory and equipment stored on the premises and, thus, I hired my own security guards to watch the premises over the August 4 weekend. My security guards informed me that no one went to the premises anytime over the weekend. I returned to the business office again on August 7 and August 8 to find that the office remained closed and that no employees or other persons were anywhere to be found.
“I hired a private investigator to try to find Roger Bevan, the owner of Boat Shack and a defendant herein. The investigator went to Roger Bevan’s house in Arab, Alabama on August 6, 1989. The investigator found that the lawn had not been mowed for several weeks and the house appeared abandoned. I, my *1356 self, went to the house on August 8,1989 and, in addition to the uncut lawn, noticed that there was a dog house in the backyard but no dog in sight. The house appeared abandoned to me.
“I have also recently discovered that another creditor of the defendants, Bombardier Credit, Inc., has filed suit against the defendants in the United States, District Court, Northern District of Alabama, Northeastern Division, Civil Action No. CV-89-HM-5342-NE, seeking seizure of equipment and inventory it financed on behalf of Boat Shack pursuant to similar terms and conditions as plaintiff’s financing arrangements. The United States Magistrate issued his findings recommending that the District Court issue a writ of seizure. A copy of Bombardier Credit, Inc.’s verified Complaint and the Magistrate’s Report and Recommendation are attached hereto. According to this Complaint, two checks issued by Boat Shack totalling approximately $25,000.00 recently were dishonored for non-sufficient funds. See paragraph 10 of Complaint. In addition, I was informed by Evinrude and MidSouth Marine Parts, two other creditors of the defendant, that they had checks issued by defendant dishonored recently in the amounts of $8,000.00 and $111.00, respectively. Thus, defendant has bounced numerous checks to numerous creditors all during the same time period and has ceased operating his business since July 29, 1989.
“The subject property is wrongfully detained by defendant in that defendant being in default of the aforesaid security agreements failed and refused to surrender plaintiff’s property to plaintiff, who is entitled to said property as aforesaid. Moreover, according to my best knowledge, information, and belief there is a substantial risk of transfer and/or damage to the property in the event defendant is allowed to continue in possession in that said defendant has already sold a large number of boats and accessories in which plaintiff has a security interest and failed to pay plaintiff for its interest in said inventory and equipment in violation of plaintiff’s rights in said agreement. Moreover, defendant’s sudden departure from the area and closure of the business without adequate safeguards of the inventory of the business leaves our security at substantial risk of theft, fire, etc.”
ITT filed its complaint and motion for writ of seizure on August 8, 1989. Count I of the complaint sought recovery of possession of the property and Counts II, III, and IV alleged breaches of the three separate financing agreements and sought damages for the balances due. The three counts sought over $600,000, and ITT executed a detinue bond in the amount of $1,200,000. The court issued the writ of seizure and authorized the sheriff to enter the premises to execute the writ. The property was seized on or about August 11.
The Bevans returned on August 12. They and the Boat Shack accepted service of the summons and complaint on September 5, but they did not enter an appearance until December 18, 1989, when they filed their answer and counterclaim. Instead, on September 8, the Boat Shack filed a Chapter 11 petition in the bankruptcy court, and Roger and Cynthia Bevan also filed a joint Chapter 11 petition. On September 22, ITT filed in the bankruptcy court a motion to lift the automatic stay so that it could proceed to judgment in its action in the circuit court. On October 13, the Boat Shack filed in the bankruptcy court a motion requesting the bankruptcy court to order ITT to return the seized property to the Boat Shack.
On March 13, 1990, the bankruptcy court issued two orders, one granting ITT’s motion to lift the stay, and the other denying the Boat Shack’s request for a return of the property. In the latter order, the bankruptcy court recited facts regarding the financing and the $78,000 in dishonored checks and continued:
“The debtor corporation has also sold property ‘out of trust,’ which means the debtor sold property in which ITT has a security interest without remitting the proceeds to ITT. It should be noted that the president of the debtor corporation, *1357 Roger Allen Bivens [sic], admitted that some of the inventory belonging to ITT had been ‘sold out of trust.’
“On or about August 1, 1989, the debt- or corportaion closed its business premises for a period of two weeks. ITT determined that the business was closed and seized its collateral from the debtor’s business premises.
“The value of the inventory which ITT seized is approximately $385,000.00. The balance of the debt owed to ITT by the debtor corporation is $609,000.00, which includes payment for the checks which were returned and inventory sold ‘out of trust.’ There is a deficiency balance owed to ITT in the approximate amount of $223,900.00.
[[Image here]]
“From the evidence presented and the foregoing conclusions of law, the Court finds, and it is ORDERED, ADJUDGED AND DECREED that the motion filed by the debtor corporation, The Boat Shack II, Inc., for return of the inventory seized by ITT Commercial Corporation be and hereby is DENIED.”
The answer filed in this action on December 18, 1989, simply denied that the defendants were in default or had breached the agreements and stated that ITT “is not entitled to possession of the inventory and equipment.” The counterclaim filed therewith had four counts: conversion, loss of business opportunities due to the wrongful detention of the property, wrongful repossession, and abuse of process in obtaining the writ of seizure through the use of “an affidavit which contained false information.” Thus, all four counts depended upon a contention that the seizure was wrongful, even though the Boat Shack and the Be-vans had not directly attacked the writ of seizure pursuant to Rule 64(b). On January 5,1990, ITT moved to dismiss the counterclaim, asserting, first, that the Bevans did not have standing to raise the claims presented because they were merely guarantors and did not have the right to possession of the property; and, second, that any objection to the writ of seizure must be made pursuant to the procedure provided by Rule 64 and that, no such challenge having been made and the order of seizure still being in effect, a counterclaim was in effect a collateral attack and could not be sustained.
Rule 64(b), Ala.R.Civ.P., provides a procedure for pre-judgment seizure of property and that rule was followed by ITT and the trial court in this case. Rule 64(b)(2)(B) provides as follows:
“Preliminary Finding for the Plaintiff; Writ of Seizure without Hearing; Hearing on Dissolution. If the court upon preliminary examination finds that the risk of concealment, transfer or other disposition of or damage to the property by permitting it to remain in the possession of the defendant between the filing of the action and the time of a hearing is real, then the court shall forthwith enter an order authorizing the issuance of a writ of seizure but the court shall provide in said order that the defendant is entitled, as a matter of right, to a prejudgment hearing on the issue of dissolution of the writ if a written request for hearing is served on counsel for the plaintiff within five days from the date of seizure of the property by the sheriff or other duly constituted officer. If such a request is made, the writ shall expire upon the fifteenth day from said date of seizure unless the court, after hearing, continues the order in effect. The expiration of the writ shall not prejudice the right of the plaintiff to a reinstatement thereof but any such reinstatement shall not be made without notice and hearing. If no request for a hearing is made within the five-day period, the writ shall remain in effect pending further order of the court but, the court, in its discretion, may hear a request for dissolution of the writ although said request is served more than five days from the date of seizure.”
(Emphasis added.)
ITT seized the property on Friday, August 11. After the Bevans returned on Saturday, August 12, they and the Boat Shack had until Wednesday, August 16, to file a motion that would have caused the writ to expire on August 26 unless ITT *1358 could have shown at a hearing that it was entitled to continued possession of the property. Even absent such a prompt challenge, they could have filed a request for such a hearing in the discretion of the court. Instead of doing either, they filed for bankruptcy on September 8.
In opposition to ITT’s motion to dismiss their counterclaim, the Boat Shack and the Bevans filed affidavits of Mary Jo Logan, Wallace Lide, James H. Waller, and Belinda Finley, all of whom were employees of the Boat Shack. Mrs. Logan stated that she told Bennett by telephone on the Monday or Tuesday of the second week in August (i.e., August 7 or 8) that Roger would be back in town on Friday, August 11, but might not be back at work until the following Monday. Lide and Waller stated that they worked in the service department for the two weeks that the Bevans were on vacation. Lide stated that, when Bennett came to the service department, Bennett did not ask him any questions and he did not say anything to Bennett.
Waller stated that he told Bennett that Roger Bevan was on vacation and that Bennett asked if that was not a strange time to be on vacation. Waller stated that he answered, “I told him that we took vacations every year, it didn’t really matter. I told him that the year before we closed for the whole month of December. He then left.” Waller’s affidavit concluded:
“Mr. Bennett asked me ... how we were going to be paid and I told him that we made our money from the service work. At no time have I ever told Carl that I was not employed by Roger Bevan and Boatshack II, at no time have I ever told Carl that I leased the service department from Roger Bevan and at no time have I ever told Carl that Roger Bevan owed me $30,000. I don’t know where he got that information from.”
Roger Bevan gave a deposition in which he claimed not to have known when he left that checks were being returned for insufficient funds, although he admitted that he knew the daily balance and that checks had been written in excess of the balance in the account. By Friday, July 28, the Boat Shack had received notification that 18 checks had been dishonored. Mr. Bevan admitted knowing of cash flow problems and described plans he had in the works when he left for covering the overdrafts by selling boats, selling land he owned, and borrowing money. He stated that he closed the sales department for vacation at the time he did because August was traditionally a time of slow boat sales.
If a trial court considers matters outside the pleadings when ruling on a motion to dismiss for failure to state a claim, the motion is deemed converted into one for summary judgment, and the granting of the motion will be deemed an entry of summary judgment. Rules 12(b) and 56, Ala.R.Civ.P.; Parker v. Hilliard, 567 So.2d 1343 (Ala.1990); Carmichael v. Riley, 534 So.2d 280 (Ala.1988); Boles v. Blackstock, 484 So.2d 1077 (Ala.1986).
Thus, without holding that a debtor must in all cases respond under Rule 64(b)(2)(B) to an ex parte writ of seizure before maintaining an action for damages caused by the seizure, we hold that the trial court did not err in this case in ruling for ITT on the counterclaim, because there was no genuine issue as to any material fact and ITT was entitled to a judgment as a matter of law. The Boat Shack and the Bevans have never presented any evidence that would have defeated ITT’s right to repossess the property if it had been presented at a hearing before or after seizure. “Unless otherwise agreed a secured party has on default the right to take possession of the collateral.” Ala.Code 1975, § 7-9-503. The financing and security agreements provided as follows: “We [the Boat Shack] will hold all of the Collateral financed by you [ITT], and the proceeds thereof, in trust for you and we will immediately account for and remit directly to you all such proceeds when payment is required under the terms of our financing program with you.” The Boat Shack was undisputedly in default under this provision.
Although the Boat Shack and the Bevans have disputed portions of Bennett’s affidavit, those portions are immaterial when *1359 considered in light of the undisputed facts that the Boat Shack issued worthless checks in late July to ITT and to at least one other secured creditor and two other suppliers;[1] that Roger Bevan, the president and sole stockholder of the Boat Shack, immediately thereafter closed the sales department, locked the main building, took the only key with him when he left on vacation, gave two weeks’ vacation to all employees except two service personnel, and left town himself for two weeks without leaving word as to how he could be reached; and that, once he returned, Bevan did not attempt to regain the property pursuant to Rule 64(b), but filed for bankruptcy.
The sales out of trust and the substantial overdrafts constituted a sufficient risk to ITT’s right to recover the property or the proceeds of its sale to establish a prima facie right to an ex parte seizure under Rule 64(b)(2)(B). The disputed portions of Bennett’s affidavit relate principally to the risk to the remaining boats and other property. For example, Bennett’s statement that the “closure of the business without adequate safeguards” subjected the property “to theft, fire, etc.” was disputed by Roger Bevan, who stated in deposition that an effective alarm system was in place. Such matters should properly have been presented in a challenge to the writ pursuant to which the trial court could have determined whether to set aside the writ of seizure. Even given all the facts that were later developed, the trial court would have been justified in entering a writ of seizure. Compare Ex parte Alabama Mobile Homes, Inc., 468 So.2d 156, 160 (Ala.1985), in which a creditor used Rule 64(b)(2)(B) to garnish[2] the proceeds of a sale of secured property, a sale effectively equivalent to the Boat Shack’s “out of trust” sales. This Court said:
“In this case it is undisputed that ITT had a security interest in the proceeds and that Alabama Mobile Homes commingled the proceeds with its own money instead of paying the funds to ITT as it had agreed to. It can hardly be disputed that there was sufficient evidence in the record before the court to support a finding of a risk of ‘concealment, transfer, or other disposition’ of the funds. The defendant’s transfer of funds to its attorney could be construed as an attempt to prevent ITT from receiving the proceeds of the sale of its collateral.”
Thus, the seizure was justifiable even in spite of the disputed portions of Bennett’s affidavit, and the trial court properly held that, under the circumstances, the failure to challenge it under the procedures provided in Rule 64(b)(2)(B) barred the counterclaim based on allegations that the seizure was wrongful.
Similarly, because the Boat Shack and the Bevans have not shown any reason why ITT would not be entitled to possession of the property pursuant to the security agreements, the trial court did not err in entering summary judgment for ITT on the count of its complaint seeking to be awarded possession of the property. Much of the argument by the appellants relates to their claim that ITT acted in a commercially unreasonable manner in repossessing or in storing the property (it had not yet been sold at the time of appeal, but the appellants argue that it had deteriorated due to exposure to the weather). They cite Ala. Code 1975, § 7-9-504, and cases such as Farmers & Merchants Bank of Centre v. Hancock, 506 So.2d 305 (Ala.1987); Terrell v. John Deere Co., 491 So.2d 918 (Ala.1986); Prescott v. Thompson Tractor Co., 495 So.2d 513 (Ala.1986); Abston v. Central Bank, 492 So.2d 1298 (Ala.1986); and Davis v. Huntsville Production Credit Ass’n, 481 So.2d 1103 (Ala.1985).
Such arguments do not tend to defeat ITT’s right to possession of the secured property, although they might be appropriate in response to ITT’s claim for the balances due under the financing agreements. However, those counts have been dismissed without prejudice: after the notice of ap *1360 peal was filed in this case, this Court remanded the cause because the dismissal of the counterclaim did not include language of final adjudication pursuant to Rule 54(b), Ala.R.Civ.P.[3] In response to the remand, ITT filed in the trial court a “motion to dismiss without prejudice all remaining claims and for amended order on motion to dismiss counterclaim.” The court granted the motion in both aspects, dismissing without prejudice Counts II-IV of the complaint and amending the dismissal of the counterclaim by adding thereto an entry of final judgment pursuant to Rule 54(b). After the court entered its order on remand, the Boat Shack and the Bevans filed an unnecessary second notice of appeal, which has been docketed as number 1900594. That appeal is superfluous and will be dismissed. See Foster v. Greer & Sons, Inc., 446 So.2d 605 (Ala.1984), overruled on other grounds, Ex parte Andrews, 520 So.2d 507 (Ala.1987).
In summary, we affirm the summary judgment on Count I of the complaint awarding possession of the property to ITT, because a clear default was shown and no substantial evidence was shown in opposition to ITT’s right to repossess the property; we affirm what we construe to be a summary judgment for ITT on the counterclaim, because the Boat Shack and the Bevans did not attempt to have the writ of seizure set aside pursuant to Rule 64(b)(2)(B) and did not produce substantial evidence that ITT did not have a right to repossess the property under the circumstances; and we dismiss appeal number 1900594 because a renewed notice of appeal after the remand for entry of a final judgment was unnecessary.
89-1571 — AFFIRMED.
1900594 — DISMISSED.
HORNSBY, C.J., and ADAMS, STEAGALL and INGRAM, JJ., concur.

. In fact, at Mr. Bevan’s deposition, it was established that, when the Bevans left for vacation on July 28, the Boat Shack’s bank account showed an overdraft of $57,000 and that, between July 13 and August 29, 1989, the Boat Shack’s bank returned 64 checks totalling more than $230,-000.

. Rules 64A and 64B were not yet in effect.

. The entry of summary judgment on Count I of the complaint did include a proper order of finality pursuant to Rule 54(b).